IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| FIRST NATIONAL BANK OF PENNSYLVANIA, AS SUCCESSOR BY MERGER TO PARK VIEW FEDERAL SAVINGS BANK, | ) ) ) ) ) | Civil Action No. 14-1007 |
| Plaintiff, | ) ) | United States Magistrate Judge |
| v. | ) ) | Cynthia Reed Eddy |
| TRANSAMERICA LIFE INSURANCE COMPANY & CLARK CONSULTING, INC., | ) ) ) ) |  |
| Defendants. | ) |  |

## <u>MEMORANDUM OPINION</u>

**Cynthia Reed Eddy, United States Magistrate Judge.**

## I. INTRODUCTION[1]

Plaintiff First National Bank of Pennsylvania ("FNB") initiated this civil action for breach of contract and insurance bad faith against the insurer of its bank owned life insurance policies, Defendant Transamerica Life Insurance Company ("Transamerica"), and for breach of fiduciary duty against its insurance broker, Defendant Clark Consulting, Inc. ("Clark"); (collectively "Defendants"). The dispute boils down to whether FNB was paid the entire amount it was owed after it surrendered the policies. FNB claims that in addition to the amount it was paid at surrender (approximately $18 million), it was owed an amount known as the "Bank Enhancement Amount" (worth more than $2.5 million) from a third-party, and that Defendants' actions directly prevented FNB from receiving it. Presently pending before the Court is

---

[1]  As noted below in Section III, all parties have voluntarily consented to have the undersigned conduct any and all proceedings in this matter, including entry of final judgment, under 28 U.S.C. § 636(c). (ECF Nos. 9, 12).

Defendants' motion for summary judgment. After careful consideration of the parties' arguments on the matter and all of the exhibits filed in connection therewith, and for the reasons that follow, the Court will grant Defendants' motion and enter summary judgment in their favor.

## II. FACTUAL BACKGROUND[2]

As will be explained in greater detail below, FNB acquired the bank owned life insurance policies at issue in this case ("the Policies") in the fall of 2013 when FNB merged with Park View Federal Savings Bank ("Park View").[3] By way of background, Park View, a federal savings bank located in Ohio at the time, purchased the Policies seven years earlier from Defendant Transamerica and Transamerica's affiliate for $20 million.[4] Defendant Clark, which is also affiliated with Transamerica, acted as the insurance broker in connection with the purchase of the Policies. Thereafter, Clark serviced the Policies and continued acting as the insurance broker after the FNB-Park View merger and through FNB's eventual surrender of the Policies in 2014.

The Policies were "separate account" policies, meaning that there were a number of different investment accounts, known as "subaccounts," to which Park View could choose to allocate its policy values. According to the parties, a bank's decision as to which subaccount(s) to allocate its policy values is informed by the material that it receives from the insurance

---

[2] When reciting the following facts, the Court will "adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In a similar vein, the Court will not reiterate any of the parties' statements labeled as "facts" in their concise statements of undisputed material fact which are, in effect, argument. *See* LCvR 56.B; *Berkoben v. Aetna Life Ins. Co.*, 8 F.Supp.3d 689, 695 n. 1 (W.D. Pa. 2014).

[3] The complaint explains that bank owned life insurance policies "are designed to assist corporations in managing employee-related expenses by providing steady tax-free returns to purchasers for use in funding current and future employee benefit expenses such as healthcare, disability, dental and group life insurance." (ECF No. 1 at ¶ 14).

[4] The affiliate merged into Transamerica a few years later; it is not relevant to this dispute.

company in a private placement memorandum ("PPM").  The PPM contains detailed disclosures about the attributes of each of the available subaccounts and the terms of any agreements with third parties that may apply if a specific subaccount is selected.  The insurance company may later add a new subaccount to the "menu" of available options, at which point the insurance company would send the bank a supplement to the PPM.

When Park View initially purchased the Policies from Transamerica in 2006, it selected the "JP Morgan Core" subaccount.  This subaccount was specified in the policy form and was described in multiple PPMs that Park View received prior to selecting it.

On August 7, 2009, Park View, through its Chief Financial Officer, signed a Customer Service Change Form for the Policies (the "2009 Change Form"), which  re-allocated 100% of Park View's policy values to a new subaccount offered by Transamerica: the "Stable Value Subaccount."  The 2009 Change Form specifically stated that Park View's re-allocation request was "subject to the restrictions of the Stable Value Subaccount."  Park View's selection of the Stable Value Subaccount meant that the following additional agreements needed to be executed by parties other than Park View to carry out the subaccount's goal: (1) a Stable Value Agreement between Transamerica and its affiliate Commonwealth General (the "SVA"), and (2) an Enhancement Amortization Agreement between Commonwealth General and JP Morgan (the "EAA").

Parenthetically, Transamerica and Commonwealth General are both subsidiaries of the same parent company.  Commonwealth General does not have any employees and was included in the SVA merely for capital and/or accounting purposes.  It is undisputed that although Commonwealth General was the signatory to the EAA, Transamerica could also exercise the rights provided to Commonwealth General in the EAA against JP Morgan.

By deciding to re-allocate its policy values into the Stable Value Subaccount, Park View agreed to additional surrender restrictions contained in the SVA and the EAA. Before Park View signed the 2009 Change Form, its CFO, independent auditor, and independent financial accountant all separately reviewed supplements to the original PPMs (which discussed, *inter alia*, surrender restrictions), as well as forms of the SVA and EAA.[5] Based on Park View's decision to re-allocate its policy values into the Stable Value Subaccount, the SVA was executed by Transamerica and Commonwealth General, and the EAA was executed by Commonwealth General and JP Morgan.

The amount owed to the Policyowner at surrender under the Stable Value Subaccount is governed by various provisions in the SVA and the EAA. Under the EAA, JP Morgan promised that, subject to certain limits and conditions which had to be "strictly satisfied," it would pay an amount known as the "Bank Enhancement Amount" to Commonwealth General at surrender.[6] Two conditions in the EAA are relevant to this dispute. The first condition was that "[t]he Polices are not, and have not been previously, owned by an entity other than the Policyowner on or prior to the Immunization Termination Date."[7] The second condition required that, within a specified time period, the Policyowner deliver "a fully executed and complete Surrender Certificate" that is "substantially in the form of the document attached as Exhibit C" to the EAA.[8] Failure to strictly satisfy either of these conditions under the EAA discharged JP Morgan's obligation to pay the Bank Enhancement Amount to Commonwealth General.

---

[5] Specifically, the supplements to the PPM contain a surrenders clause stating that if the Policyowner surrenders the Policies, then the proceeds will be paid pursuant to a settlement option where "Transamerica will not pay out more than it receives from the Stable Value Agreement and from the liquidation of the assets of the Stable Value Portfolio." Def.s' Exs. F & G (ECF Nos. 91-6 at 4, 91-7 at 4).

[6] Def.s' Ex. I (ECF No. 91-9), *hereafter,* "EAA at __."

[7] EAA at § 2(vi).

[8] EAA at § 2(ii); *see also id.* at § 10 p. 20 (definition of "Surrender Certificate").

Under the SVA, the amount owed to the Policyowner was to be determined after the Policyowner provided notice of surrender.[9]  The parties offer different views as to how the agreements operate if JP Morgan were to incorrectly withhold the Bank Enhancement Amount.[10]  In any event, they agree that if JP Morgan *correctly* refused to pay the Bank Enhancement Amount to Commonwealth General under the EAA, then, ultimately, Transamerica would not be obligated to pay the Bank Enhancement Amount to the Policyowner at surrender.[11]

A few years after Park View selected the Stable Value Subaccount, in the summer of 2012, FNB's parent company was considering a potential acquisition of Park View's parent company and began conducting due diligence of Park View.  On February 19, 2013, FNB's parent and Park View's parent publicly announced that they had entered into an Agreement and Plan of Merger (the "Parent Merger Agreement").  The Parent Merger Agreement provided that Park View's parent would merge with and into FNB's parent, and that FNB's parent would be

---

[9]  Def.s' Ex. Q (ECF No. 92-1), *hereafter,* "SVA at __."

[10]  Defendants contend, in light of the surrenders clause in the supplements to the PPM stating that "Transamerica will not pay out more than it receives from the Stable Value Agreement and from the liquidation of the assets of the Stable Value Portfolio," that Transamerica would not be obligated to pay the Bank Enhancement Amount to FNB if JP Morgan did not pay it in the first instance, regardless of whether JP Morgan's decision was right or wrong.  *See*, *e.g.*, Def.s' Concise Stmt (ECF No. 91 at p. 5, ¶¶ 7-8).  FNB counters that the surrenders clause in the supplements is not controlling here because it is subordinate to the other express agreements, which, according to FNB, contain conflicting provisions.  Instead, FNB asserts that if JP Morgan incorrectly refused to pay the Bank Enhancement Amount, then an "Event of Default" provision in Section 5 of the EAA would be triggered, which would obligate Commonwealth General (or Transamerica) to notify JP Morgan in writing of its default and demand payment.  *See, e.g.,* Pl.'s Resp. Concise Stmt (ECF No. 99 at pp. 2-3, ¶¶ 7-8).  The parties' dispute as to this issue, however, is not material because, as discussed at length below, JP Morgan's refusal to pay the Bank Enhancement Amount was correct.

[11]  SVA at § 3(A)(vi)(ii) ("If … the Agreement terminates according to Section 4(a)(ii) …, the Investment Value will be reduced by … the Bank Enhancement Amount for such day."); *see also* §§ 4(A)(i)-(ii) , 6(A), 6(B), 24; FNB's Resp. Br. (ECF No. 98 at 16-17) ("F.N.B. agrees that if JP Morgan had – for contractually permissible reasons – withheld payment of the BEA, Transamerica had no duty to pay the BEA to F.N.B.").

the surviving entity.[12]   It also provided that, as soon as practicable after the execution of the agreement, both parent companies would cause their subsidiaries, FNB and Park View respectively, to enter into a merger agreement of their own (the "Bank Merger Agreement").  A form of the Bank Merger Agreement was attached to the Parent Merger Agreement.

The Bank Merger Agreement provided, subject to the terms and conditions of the Parent Merger Agreement, other terms in the Bank Merger Agreement, and approval from the relevant national bank regulator, the Office of the Comptroller of the Currency ("OCC"), that Park View would merge "with and into" FNB and FNB "shall be the surviving bank."[13]  Describing the effects of the merger, the Bank Merger Agreement further stated that:

> Upon consummation of the Bank Merger, and in addition to the effects set forth at 12 U.S.C. § 215c, the applicable provisions of the regulations of the OCC and other applicable law . . . the Surviving Bank shall be considered the same business and corporate entity as each constituent bank with all the rights, powers and duties of each constituent bank . . . all in accordance with the provisions of The National Bank Act.[14]

The OCC approved the merger of Park View "with and into" FNB under 12 U.S.C. § 215c "based on a thorough review of all information available, including commitments and representations made in the application, merger agreement, and those of [the] representatives."[15] The OCC's approval letter noted that the merger was subject to "applicable OCC regulations and policies."[16]

Meanwhile, on May 3, 2013, which was approximately two and a half months after Park View and FNB entered into the Bank Merger Agreement but prior to the OCC's approval, Park

---

[12]   Def.s' Ex. S-1, Art. 1 § 1.1 (ECF No. 93-1).
[13]   Def.s' Ex. T (ECF No. 93-5).
[14]   *Id.* at § 6.
[15]   Def.s' Ex. U (ECF No. 93-6).
[16]   *Id.*

View contacted Clark for the first time about the merger. Park View's CFO sent an e-mail to Clark's Senior Consultant, Chris Parker, to notify Mr. Parker that Park View was being acquired by FNB and to inquire whether there was anything that needed to be done "regarding carrier or other notifications" in light of the approaching closing of the merger transaction set for October 12, 2013.[17] Mr. Parker responded that the carriers do not need advance notice, but "[o]nce the transaction is complete, there are potentially some changes we would want to make," including making "FNB the owner because when there are future deaths, it makes the process of getting paid somewhat easier for the bank."[18]

A few months later, on August 29, 2013, an FNB representative sent Mr. Parker an e-mail to coordinate the transition of Park View's Policies to FNB in October 2013.[19] Mr. Parker responded by stating that such an acquisition can "create[] some challenges" regarding the payment of checks when a future death occurs, so some paperwork would need to be signed by a Park View representative "that acknowledges the new official signers at FNB" after the acquisition occurs.[20] The FNB representative then stated: "Yes. I know all about the official signer issue. FNB has done many acquisitions and is familiar with the process."[21]

On September 18, 2013, a different FNB representative contacted Transamerica for purposes of "obtaining the necessary procedures and documentation required to make the Owner/Beneficiary change of the Policies currently Owned by Park View."[22] Transamerica advised that FNB would need to complete a "Customer Service Change form," including Section

---

[17] Pl.'s Ex. 3 (ECF No. 100-3 at 3).
[18] *Id.* at 2.
[19] Pl.'s Ex. 5 (ECF No. 100-5 at 4).
[20] *Id.* at 3.
[21] *Id.* at 2.
[22] Pl.'s Ex. 10 (ECF No. 100-10 at 4).

5 relating to "Ownership Change," after the acquisition.[23]

As expected, FNB's acquisition of Park View closed on October 12, 2013. Four days later, FNB's Treasurer, Scott D. Free, completed the "Customer Service Change Form" for the Policies (the "2013 Change Form") in accordance with Transamerica's instructions from the previous month, and Transamerica recognized FNB as the "New Owner" of the Policies.[24] Mr. Free testified in his deposition that shortly after FNB closed on its acquisition of Park View, he obtained all of the documents in Park View's possession and specifically reviewed the surrenders clause in the supplements to the PPM and the unexecuted forms of the SVA and the EAA.[25]

In late December 2013, Mr. Free advised Mr. Parker of Clark that FNB was considering a surrender of the Policies. Mr. Parker responded via e-mail to Mr. Free on December 31, 2013. In this message, Mr. Parker warned Mr. Free that JP Morgan might refuse to pay a specific amount at surrender – the Bank Enhancement Amount – based on certain language in the EAA. Specifically, this e-mail states, in relevant part, the following:

> Just so you are aware, I don't think JP Morgan is going to play "nice" on this. They are currently having their attorneys review the surrender language. The bottom of page 22 and top of page 23 of the pdf file lists some documentation requirements for surrender [in the EAA], including the following:
>
> > a representation that the Polices are not, and have not been previously, owned by an entity other than the Policyowner on or prior to the Immunization Date;
>
> I was taken by surprise that their attorneys would review this, and it would seem like a stretch to apply this language to an acquisition. However, I wanted you to be aware that this is why JP Morgan hasn't sent us the official surrender reps letter. . . .[26]

---

[23] *Id.* at 2.
[24] Def.s' Ex. L (ECF No. 91-12).
[25] Def.s' Ex. V (ECF No. 91-7 at 10).
[26] Pl.'s Ex. 11 (ECF No. 100-11 at 2).

A few days later, on January 3, 2014, Barbara Scoles from Transamerica had a conversation with a JP Morgan representative about the same topic. The JP Morgan representative informed Ms. Scoles that JP Morgan "did not believe that Park View could make the [continuous] ownership rep[resentations]" and that its "legal group was looking at the question."[27] Within the next few days, Ms. Scoles had a phone conversation with Mr. Parker where she informed him of this conversation with JP Morgan.[28] Transamerica and Clark ultimately ended up agreeing with JP Morgan's conclusion that FNB could not satisfy the continuous ownership condition in the EAA.[29]

Mr. Parker testified during his deposition that Clark's entire "investigation" into whether FNB could satisfy this condition was one phone call "to JP Morgan to ask whether or not this

---

[27] Pl.'s Ex. 15 (ECF No. 100-15).

[28] *Id.*

[29] FNB faults Defendants for failing to notify FNB of JP Morgan's communication to Transamerica on January 3, 2014. FNB asserts that "entirely unbeknownst to" it, by January 3, 2014, JP Morgan had already communicated to Transamerica that JP Morgan did not believe that FNB could meet the continuous ownership representation condition in the EAA. Pl.'s Concise Stmt. (ECF No. 99 at p. 11, ¶ 2). But there are no material differences between this January 3, 2014 communication and the e-mail that Mr. Parker had already sent FNB just a few days earlier. In Mr. Parker's e-mail from December 31, 2013, he warned FNB that he did not think JP Morgan was going to play "nice" and directed FNB to the specific contractual provision that JP Morgan's attorneys were reviewing to determine whether JP Morgan could refuse payment of the Bank Enhancement Amount. The contents of the January 3, 2014 communication between Transamerica and JP Morgan – that JP Morgan "did not believe that Park View could make the ownership rep[resentations]" and its "legal group was looking at the question" – essentially mirror what Mr. Parker said in his e-mail to FNB a few days earlier. Thus, FNB's assertion that it was somehow harmed by not receiving this cumulative information is a total exaggeration. Moreover, FNB's belief that it would have changed JP Morgan's, Transamerica's, and/or Clark's "erroneous conclusion" on this issue had it known about this conversation is unwarranted speculation, especially given that, as explained more fully below, the conclusion was not erroneous, but correct. *See Roberston v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990) (courts do not credit a party's inference based upon speculation or conjecture at the summary judgment stage).

would potentially be an issue."[30]  In the phone call, the JP Morgan representative did not give Mr. Parker a definitive answer.[31]  When asked whether he did "anything more than make a [single] phone call," Mr. Parker responded: "No. I had Mr. Free aware of the issue, and they've got lots of attorneys that provide advice.  So I left it to him."[32]  FNB does not dispute that its own attorneys were looking into the situation and providing advice on the matter.

In early March 2014, FNB, through Mr. Free, elected to surrender the Policies. Thereafter, Clark provided guidance, assistance, and advice to FNB regarding the procedures and representations commensurate with the surrender of the Policies.  Of relevance here, Clark provided a draft form to FNB called a "Surrender Certificate" that contained numerous representations that the Policyowner had to make.  As stated above, it was a separate condition under the EAA that, within a specified time period, the Policyowner deliver "a fully executed and complete Surrender Certificate" that is "substantially in the form of the document attached as Exhibit C" to the EAA.[33]

The Surrender Certificate form that Clark provided to FNB complied with this provision in the EAA.  Before FNB submitted the Surrender Certificate form, however, it deleted five paragraphs therein, with the effect being that the Surrender Certificate was no longer "substantially in the form of the document attached as Exhibit C" to the EAA.[34]  In particular, FNB deleted a representation stating that if JP Morgan determined that any of the representations made by FNB were not true, including the representation that FNB was the continuous owner of

---

[30]  Pl.'s Ex. 13 (ECF No. 100-13).
[31]  *Id.*
[32]  *Id.*  Similarly, Mr. Parker testified that although he had a concern about whether FNB could satisfy the continuous ownership representation in the EAA as of January 8, 2014, he did not discuss the issue again with FNB "because FNB is a large financial institution who has its own attorneys, and we don't provide legal advice."  Pl.'s Ex. 39 (ECF No. 100-39 at 4).
[33]  EAA at § 2(ii).
[34]  EAA, Ex. C; Def.s' Ex. W, Free Dep. (ECF No. 93-8 at 9).

the Policies, then FNB "expressly agrees to pay [JP Morgan] an amount equal to . . . the amount paid by [JP Morgan] . . . in connection with the surrender," plus interest, legal fees, and expenses incurred by JP Morgan.[35]

In Mr. Free's deposition, he explained that the reason he deleted this representation was because FNB felt that JP Morgan was taking an erroneous position in concluding that FNB could not satisfy the continuous ownership condition in the EAA and, therefore, FNB "needed to protect [itself] with this other agreement."[36]  Mr. Free explained that he deleted this paragraph only after FNB sought adequate assurance from JP Morgan that it would pay the Bank Enhancement Amount if FNB made the representation.  Because FNB "could not get any adequate assurance that [JP Morgan was] going to pay" the amount, FNB decided to delete the representation from the form Surrender Certificate.  In doing so, FNB did not rely on any advice from Defendants, and instead deferred to its own in-house legal counsel on the matter.[37]

On March 11, 2014, JP Morgan notified Transamerica in writing that it was refusing to pay the Bank Enhancement Amount.[38]  The letter stated that because FNB failed to satisfy two conditions in the EAA, JP Morgan was not obligated under the Agreement to pay the Bank Enhancement Amount.  Specifically, the letter stated as follows:

> Notice is hereby given by J.P. Morgan that the conditions in Section 2(ii) and Section 2(vi) of the [EAA] have not been satisfied:
>
> • Section 2(vi) of the [EAA] requires that "[t]he Polices are not, and have not been previously, owned by an entity other than the Policyowner on or prior to the Immunization Termination Date", and the [EAA] separately defines the "Policyowner" as "Park

---

[35]  *Compare* EAA, Ex. C *with* Def.s' Ex. N (ECF No. 91-14).
[36]  Pl.'s Ex. 20 (ECF No. 100-20).
[37]  Def.s' Ex. X (ECF No. 93-9) (e-mail from Mr. Free to Mr. Parker) ("I have my legal looking at this right now.  I've already read through.  I don't have an issue, but will defer to my counsel.").
[38]  Pl.'s Ex. 9 (ECF No. 100-9 at 4).

View Federal Savings Bank".  Given that (i) Park View Federal Savings Bank is no longer in existence and (ii) the owner of the Polices has changed from Park View Federal Savings Bank to FNB PA, Section 2(vi) of the [EAA] has not been satisfied.

- Separately, Section 2(ii) of the [EAA] requires, in part, that "the Policyholder had, within five (5) Business Days after the Surrender Notice Date, delivered to Transamerica a fully executed and complete Surrender Certificate", and the [EAA] separately defines a "Surrender Certificate" as "a certificate from an officer of the Policyholder required pursuant to Section 2 for the benefit of J.P. Morgan, substantially in the form of the document attached as Exhibit C."  Given that (i) Park View Federal Savings Bank is no longer in existence, such that the Policyowner cannot submit the notice, and (ii) neither of the written notices that FNB PA submitted to Transamerica on March 10, 2014 was substantially in the form of the document as Exhibit C to the [EAA], Section 2(ii) of the [EAA] has not been satisfied.[39]

Under the structure of the relevant agreements, JP Morgan was to pay the Bank Enhancement Amount to Commonwealth General; then Commonwealth General would pay the Bank Enhancement Amount to Transamerica; and then Transamerica would pay the Bank Enhancement Amount to FNB.  At the time of surrender, the Bank Enhancement Amount was worth about $2.5 million.  Because JP Morgan refused to pay the Bank Enhancement Amount, Transamerica did not include the Bank Enhancement Amount in the amount that it paid to FNB at surrender.  After deducting the Bank Enhancement Amount, Transamerica paid FNB approximately $18 million, which Defendants assert is the full amount available from liquidation of the assets Park View had re-allocated to the Stable Value Subaccount.  Thereafter, FNB attempted to get JP Morgan to reconsider paying the Bank Enhancement Amount by reaching out to its various contacts at JP Morgan.  Those attempts, however, were unsuccessful.

### III.  PROCEDURAL HISTORY

This lawsuit followed.  FNB filed a complaint against Transamerica and Clark on July

---

[39]  *Id.*

28, 2014, asserting the following claims: (i) breach of contract against Transamerica; (ii) breach of fiduciary duty against Transamerica and Clark; and (iii) insurance bad faith against Transamerica. The case was initially assigned to the Honorable Cathy Bissoon but was reassigned to the undersigned in September 2014 after all of the parties consented to jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). (ECF Nos. 9, 12); *see also Roell v. Withrow*, 538 U.S. 580, 585 (2003) (when all parties consent to a magistrate judge under § 636(c), "the magistrate judge [has] full authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review").

Defendants responded to the complaint by filing a Rule 12(b)(6) motion to dismiss for failure to state a claim. The Court granted the motion, in part, dismissing only the claim for breach of fiduciary duty against Transamerica, reasoning that it was duplicative of Plaintiff's other claim for insurance bad faith against Transamerica. *See* Memorandum Opinion and Order (ECF No. 23); *First Nat'l Bank of Pa. v. Transamerica Life Ins. Co.,* 2015 WL 321657 (W.D. Pa. 2015). The Court denied the motion in all other respects. *Id.*

Defendants then attempted to add JP Morgan to this action by filing a third party complaint against it. JP Morgan responded by filing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, which the Court granted. *See* Memorandum Opinion and Order (ECF Nos. 65, 66); *First Nat'l Bank of Pa. v. Transamerica Life Ins. Co.*, 2016 WL 520965 (W.D. Pa. 2016).

Shortly thereafter, the Court held a case management conference and the parties proceeded to discovery. After discovery closed, the Court held another conference with the parties where a summary judgment schedule was discussed and issued. In accord with that schedule, Defendants filed the pending motion for summary judgment. (ECF No. 89). The

motion has been fully briefed (ECF Nos. 90, 98, 103, 106, 109) and the record fully developed. (ECF Nos. 91-1-16, 92-1-2, 93-1-10, 94, 95, 99, 100-1-60). Accordingly, the matter is ripe for disposition.

## IV. JURISDICTION

Because federal courts "are courts of limited jurisdiction," possessing "only that power authorized by Constitution and Statute," we must begin by confirming that the Court has subject matter jurisdiction to hear this dispute. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). FNB asserts in the complaint that subject matter jurisdiction is satisfied under 28 U.S.C. § 1332(a)(1), which grants federal district courts original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states." Although Defendants do not challenge the Court's subject matter jurisdiction, the Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("subject matter delineations must be policed by the courts on their own initiative").

The party that commences the action in federal court bears the burden of establishing subject matter jurisdiction. *Kokkonen*, 511 U.S. at 377. Where, as here, the purported basis for jurisdiction is diversity of citizenship jurisdiction under § 1332(a), the citizenship of the parties at the time the action was commenced is what controls. *See Grupo v. Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004); *see also* Charles Alan Wright & Arthur R. Miller, 13E Federal Practice & Procedure Juris. § 3608 (3d ed.). FNB commenced this action on July 28, 2014 when it filed its complaint. *See* Fed.R.Civ.P. 3 ("A civil action is commenced by filing a

complaint with the court."). Therefore, FNB bears the burden of establishing jurisdiction on that date.

Determining the citizenship of FNB (a national banking association) and Transamerica (a corporation) is relatively straight forward. By statute, national banking associations are "deemed citizens of the States in which they are respectively located," 28 U.S.C. § 1348, which the Supreme Court has construed as meaning only "the State in which its main office, as set forth in its articles of association, is located." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006). Because FNB is a national banking association with its main office located in Greenville, Pennsylvania, as specified in its articles of association, (ECF No. 87 at ¶ 3), it is a citizen of Pennsylvania for diversity purposes. Additionally, Transamerica, as a corporation, is deemed a citizen of its (1) place of incorporation and (2) principal place of business, *i.e.,* the corporation's "nerve center." 28 U.S.C. § 1332(c); *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). Because it is undisputed that Iowa is both Transamerica's place of incorporation and its principal place of business, Transamerica is a citizen of Iowa for diversity purposes. (ECF No. 87 at ¶ 4); (ECF No. 25 at ¶ 12); *see also Transamerica Life Ins. Co. v. Peggy Carskadon Bagala*, 2016 WL 3144380, *3 (E.D. La. 2016).

Clark's citizenship, however, is not as obvious. While the complaint identifies Clark as a corporation, the parties' filings and submissions in advance of the case management conference indicated that Clark was actually a limited liability company ("LLC") when the action was commenced. Based on these submissions, it also seemed that Clark was composed of several layers of other entities. This distinction as to whether Clark was an LLC or a corporation at the time the action was commenced matters because "Congress never expanded [the] grant of citizenship [in § 1332(c)] to include artificial entities other than corporations." *Americold Realty*

*Trust v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016).

Although LLCs and corporations share many common characteristics, LLCs are treated like partnerships and other unincorporated associations for diversity jurisdiction purposes. *See Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010). Therefore, unlike corporations, the "principal place of business of an [LLC] is … irrelevant to determine if diversity jurisdiction exists." *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013). Instead, "the citizenship of an LLC is determined by the citizenship of its members." *Zambelli*, 592 F.3d at 420. In situations "where an LLC has, as one of its members, another LLC, 'the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be' to determine the citizenship of the LLC." *Id.* (quoting *Hart v. Terminex Int'l.*, 336 F.3d 541, 543 (7th Cir. 2003)); *see also Americold*, 136 S. Ct. at 1015 (noting that the "members" of an unincorporated entity or association are its owners; and in the context of partnerships, the members are the partners).

When the Court learned that Clark was an LLC with multiple layers of members, the Court discussed this issue with the parties at the case management conference and ordered that FNB file a certificate confirming that complete diversity of citizenship exists in this case. (ECF Nos. 71, 86). FNB filed its certificate on October 12, 2016. (ECF No. 87). According to the certificate, on July 28, 2014 – the date that FNB commenced the case – Defendant Clark was wholly owned by Clark, LLC. *Id.* at ¶ 5. Clark LLC, in turn, was wholly owned by Transamerica Retirement Solutions Corporation. *Id.* at ¶ 6. Transamerica Retirement Solutions Corporation was incorporated in Delaware and had its principal place of business in New York on that date. *Id.* at ¶ 7. The parties identify no other members of Clark. The Court concludes, therefore, that Clark was a citizen of Delaware and New York for diversity jurisdiction purposes

when this action was commenced.

Consequently, the Court has subject matter jurisdiction in this case under 28 U.S.C. § 1332 because at the time the action was commenced, the amount in controversy was more than $75,000 and FNB (a citizen of Pennsylvania) was completely diverse from Defendants Transamerica (a citizen of Iowa) and Clark (a citizen of Delaware and New York). Having determined that subject matter jurisdiction exists, the Court will proceed to consider the merits of the dispute.

## V. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, when "view[ing] the facts in the light most favorable to the nonmoving party and draw[ing] all reasonable inferences in that party's favor," the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Pearson v. Prison Health Svc.*, 850 F.3d 526, 534 (3d Cir. 2017) (internal marks and citation omitted). "To assess whether the moving party has satisfied this standard, we do not engage in credibility determinations." *Id.*

## VI. DISCUSSION

### A. Breach of Contract Claim against Transamerica

Defendants' primary argument is that under the plain terms of the governing agreements (the SVA and the EAA), FNB's breach of contract claim against Transamerica must fail. A breach of contract claim consists of three elements: (1) the existence of a contract, (2) a breach of

the contract, and (3) resultant damages. *Meyer, Darragh, Buckler & Eck, P.L.L.C v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016); *Nnazor v. Cent. State Univ.*, __ N.E.3d __, 2016 WL 7493651, *4 (Ohio App. 2016). Because JP Morgan refused to pay the Bank Enhancement Amount at surrender, Defendants assert that the governing agreements provide that the amount owed to FNB was to be reduced by the Bank Enhancement Amount, which at the time was worth more than $2.5 million. Accordingly, when Transamerica deducted the Bank Enhancement Amount and promptly paid FNB approximately $18 million, Defendants contend this payment totaled the entire amount owed to FNB under the Policies. As such, Defendants argue that Transamerica did not breach its contract with FNB and that summary judgment should be entered in favor of Transamerica.

In response, FNB agrees that if JP Morgan's refusal to pay the Bank Enhancement Amount was in fact correct, then Transamerica had no duty under the governing agreements to pay FNB the Bank Enhancement Amount. But FNB asserts that Defendants' legal arguments here are a red herring because JP Morgan's refusal to pay the Bank Enhancement Amount was wrong. FNB asserts that since it was not a party to the EAA, it could not enforce the EAA's terms against JP Morgan. There is no dispute that although the EAA was between Commonwealth General and JP Morgan, Transamerica could enforce its terms. Thus, FNB explains that its breach of contract theory against Transamerica is premised on Transamerica's failure to act in FNB's favor once Transamerica learned that JP Morgan would be withholding the Bank Enhancement Amount based on flawed reasons.

Given that FNB concedes that its breach of contract claim fails if JP Morgan's reasons were correct, the Court will turn to that issue now. To recapitulate, JP Morgan withheld the Bank Enhancement Amount because it determined that FNB failed to "strictly satisfy" two

conditions in the EAA: (1) that "[t]he Polices are not, and have not been previously, owned by an entity other than the Policyowner on or prior to the Immunization Termination Date," and (2) FNB did not deliver "a fully executed and complete Surrender Certificate" that was "substantially in the form of the document attached as Exhibit C" to the EAA.[40] The Court will address the propriety of these two reasons in turn.

### 1. Whether Park View Continued within FNB after the Merger

Because FNB acquired the Policies through the FNB-Park View merger that closed in October 2013, JP Morgan determined that when FNB surrendered the Policies in March 2014, FNB could not strictly satisfy the condition that "[t]he Polices are not, and have not been previously, owned by an entity other than the Policyowner on or prior to the Immunization Termination Date." JP Morgan concluded that FNB could not satisfy this condition because the original Policyowner, Park View, was no longer in existence and the owner of the Policies had since changed to FNB. To determine whether this conclusion was correct, the Court must examine the Bank Merger Agreement between FNB and Park View, as well as the relevant national bank laws, regulations, and interpretations from the OCC.

The Bank Merger Agreement states that pursuant to 12 U.S.C. § 215c, Park View would merge "with and into" FNB, with FNB being "the surviving bank."[41] This agreement also states that "in addition to the effects set forth at 12 U.S.C. § 215c, the applicable provisions of the regulations of the OCC and other applicable law," FNB "shall be considered the same business and corporate entity as each constituent bank with all the rights, powers and duties of each constituent bank . . . all in accordance with the provisions of The National Bank Act." Thereafter, the OCC approved the merger under 12 U.S.C. § 215c "based on a thorough review

---

[40]  EAA at § 2(ii), (vi).
[41]  Def.s' Ex. T (ECF No. 93-5).

of all information available, including commitments and representations made in the application, merger agreement, and those of [the] representatives."[42]  The OCC's approval letter generally noted that the merger was subject to the "applicable OCC regulations and policies," but it did not specifically address whether Park View completely ceased to exist (as JP Morgan determined and Defendants argue) or continued within FNB (as FNB argues).[43]

The authority for the FNB-Park View merger, 12 U.S.C. § 215c, was originally enacted as part of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") to expand the types of bank mergers that were permitted under the national bank laws at the time. Pub. L. No. 102-242, Title V, § 502(b), 105 Stat. 2393 (adding Revised Statutes § 5156A). Subject to various other laws and approval by the OCC, Section 215c authorizes a national bank (like FNB) to acquire or be acquired by an insured depository institution (like Park View).  12 U.S.C. § 215c(a).

Unlike some of the similar national bank statutes relating to bank consolidations and mergers that came before it, Section 215c does not contain a corporate succession provision, *i.e.,* a provision relating to the status of the corporate existence of the banks participating in the transaction.   In contrast, at 12 U.S.C. §§ 215 and 215a, which authorize other bank mergers/consolidations not relevant to this case, Congress included express corporate succession provisions stating that all participating banks or banking associations "shall be merged into and continued in the consolidated [or receiving] … banking association" and that the consolidated or receiving association "shall be deemed to be the same corporation as each bank or banking association participating in the consolidation [or the merger]."  *See* 12 U.S.C. §§ 215(e), 215a(e). FNB argues that although Section 215c does not contain such a corporate succession provision,

_____

[42]   Def.s' Ex. U (ECF No. 93-6).
[43]   *Id.*

20

the applicable OCC regulations and interpretations provide that the corporate succession provisions of Sections 215 and/or 215a applied to the FNB-Park View merger as a matter of law. Defendants assert, however, that the regulation FNB relies on does not apply and they argue that a different regulation does. They also contend that the OCC interpretations are not favorable to FNB.

Before addressing the specific OCC regulations and interpretations, the Court notes that the parties are at least in agreement that "the OCC's long-held statutory and regulatory interpretations . . . are entitled to great weight and the OCC's interpretation and regulations implementing Section 215c . . . should not be disturbed." (ECF Nos. 98 at 12, 103 at 6 n. 6); *see also Nat'l City Bank of IN v. Turnbaugh*, 463 F.3d 325, 332 (4th Cir. 2006) (in cases of statutory silence, courts must defer to the OCC's interpretation of the governing statute, so long as the interpretation is permissible in light of the statutory text and is reasonable); *Aguayo v. U.S. Bank*, 653 F.3d 912, 920-21 (9th Cir. 2011) ("When an agency such as the OCC offers an 'interpretation of its own regulation [that] reflects its considered view,' the court should accept the interpretation if it is not 'merely a *post hoc* rationalization.'") (alteration and emphasis in original; citation omitted). The parties also agree that the Court must apply the applicable regulations that were in place at the time of the merger. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 204 (2011) (the analysis begins with the text of the regulation in effect at the time the dispute arose). As such, with this basic framework in mind, the Court will address the parties' conflicting arguments regarding what regulations apply and what the relevant OCC interpretations are.

Defendants urge the Court to apply 12 C.F.R. § 152.13.[44]  On its face, however, this

---

[44]  This regulation was subsequently removed by the OCC in 2015 and integrated into other

regulation has no relevance to the FNB-Park View merger. Its scope of authority does not include Section 215c in its list of various national bank statutes. 12 C.F.R. § 152.13(a). Further, the provisions of this regulation that Defendants cite only apply to combinations between depository institutions. *Id.,* at § 152.13(b)(1)-(6). By definition, a national bank like FNB is not a depository institution. *See, e.g.,* 12 U.S.C. § 215c ("any national bank may acquire or be acquired by any insured depository institution"). Therefore, this regulation is irrelevant to the FNB-Park View merger.

The Court instead agrees with FNB that the version of 12 C.F.R. § 5.33 that was in place at the time of the merger (effective from July 1, 2008 to June 30, 2015) is generally applicable. But at the same time, the Court ultimately rejects FNB's argument that when the FNB-Park View merger occurred in 2013 pursuant to Section 215c, the corporate succession provisions located in Sections 215 and 215a were incorporated through this regulation.

In general, Section 5.33 "sets forth the provisions governing business combinations and the standards for (1) OCC review and approval of an application for a business combination between a national bank and another depository institution resulting in a national bank . . .; and (2) Requirements of notices and other procedures for national banks involved in other combinations with depository institutions." 12 C.F.R. § 5.33(b)(1)-(2). Relevant here, subsection (g)(2) governs consolidations and mergers with Federal savings associations (Park View) under 12 U.S.C. § 215c resulting in a national bank (FNB). *Id.*, at § 5.33(g)(2). Notably, Section 5.33(g)(2) speaks to only the *procedures* that must be followed when the banks are seeking the OCC's approval for such a merger. In this regard, it requires that a bank entering into a consolidation or merger under Section 215c follow the same procedures already utilized in

---

OCC rules. 80 Fed. Reg. 28346-01 (May 18, 2015). The version cited by the Court was effective from July 21, 2011 to June 30, 2015.

mergers under Sections 215 and/or 215a. *Id.*, at § 5.33(g)(2)(i)(A).

Although this provision of the regulation does nothing more than borrow the procedures from Sections 215 and 215a for mergers under Section 215c, FNB contends that it also incorporates the corporate succession provisions from those statutes. This argument, however, is not supported by the text of the regulation or by the OCC interpretive decisions that FNB cites. The plain text of Section 5.33(g)(2) clearly applies to only merger application procedures, not substantive rules like the effects of corporate succession. This conclusion is reinforced by looking to other provisions of the same regulation. *See Cumberland Coal Res., LP v. Fed. Mine Safety & Health Revie Comm'n*, 515 F.3d 247, 254 (3d Cir. 2008) (principles of statutory construction require that courts read a regulation as a whole so that effect is given to all of its provisions). In particular, at subsections (g)(4) and (g)(5) of Section 5.33, the OCC not only instructed that the banks seeking approval to merge follow the procedures of Sections 215a and 214a, respectively, but also explicitly incorporated the relevant corporate succession provisions of those laws in separate subparagraphs. 12 C.F.R. § 5.33(g)(4)(ii), (v); (g)(5)(ii), (v).

Here, in contrast, subsection (g)(2) does not contain an additional subparagraph regarding corporate succession; it only adopts the procedures of Sections 215 and 215a. Accordingly, accepting FNB's interpretation of subsection (g)(2) would improperly render superfluous subsections (g)(4) and (g)(5) of the same regulation. *See Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 133 S. Ct. 1166, 1178 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same [regulatory] scheme."). In other words, the Court cannot assume that the OCC implicitly adopted a corporate succession provision in one part of the regulation when in other parts of the same regulation it explicitly set forth such provisions in separate subparagraphs. To be sure, when the OCC was in the process

of promulgating Section 5.33(g)(5)(v) in 2003, it specifically stated: "in our view it is important to be clear that the surviving nonbank affiliate does enjoy corporate succession." 68 Fed. Reg. 70122-01, 2003 WL 22955723 (Dec. 17, 2003).[45] Therefore, when reading the regulation as a whole, FNB's position is untenable.

FNB fares no better by citing to OCC interpretive decisions. FNB contends that "since 1994 the OCC has determined that the corporate succession provisions of Sections 215 and 215a . . . apply to mergers consummated under Section 215c." (ECF No. 98 at 10). Despite this seemingly strong assertion, FNB does not direct the Court to a single OCC decision supporting its premise.

For example, FNB refers the Court to a 2004 OCC conditional approval decision that does not apply to or even discuss Section 215c. *See* OCC Conditional Approval No. 658, 2004 WL 2725968 (Oct. 13, 2004) (assessing a merger application under 12 U.S.C. § 215a-1). FNB relies on a footnote in that decision where the OCC explained that the corporate succession provision of Section 215a(e) (which FNB seeks to invoke in this case) applies to mergers under Section 215a-1 (which does not apply to this case). *Id.* at *17 n. 35. The OCC concluded that by

---

[45] Moreover, following the FNB-Park View merger in 2015, the OCC amended the regulation – in a completely different subsection – so that corporate succession now occurs "[i]n any consolidation or merger in which the resulting institution is a national bank or Federal savings association, on the effective date of the merger or consolidation." 12 C.F.R. § 5.33(l). In other words, the OCC left in place subsection (g)(2), which only incorporates the *procedures* of Sections 215 and 215a, and added the completely "*new*" subsection (l) for purposes of reflecting the corporate succession provisions of the various national bank statutes and to continue the "*substance*" of its then-current regulations that already dealt with corporate succession of Federal savings associations in other merger transactions not relevant to this case. 80 Fed. Reg. 28346-01, 2015 WL 2337260, *28374 & nn. 73, 74 (May 18, 2015) (emphasis added). Contrary to FNB's argument, the implementation of this new corporate succession provision by the OCC in 2015 does not help it. If anything, it crystalizes the Court's conclusion that Section 5.33(g)(2) is merely procedural and that prior to 2015, the corporate succession provisions of other national bank statutes did not extend to mergers like the FNB-Park View merger governed by Section 215c.

authorizing mergers "under this Act" when it enacted Section 215a-1, Congress was making mergers under Section 215a-1 subject to other types of bank mergers already authorized under the National Bank Consolidation and Merger Act, including Section 215a. *Id.* (emphasis in original).[46] But unlike mergers under Section 215a-1, mergers under Section 215c (such as the FNB-Park View merger) are not mergers under the National Bank Consolidation and Merger Act. Congress enacted Section 215c as part of the FDICIA without any reference to the National Bank Consolidation and Merger Act.[47] Therefore, this 2004 OCC decision does not support FNB's theory that the corporate succession provision of Section 215a(e) applies to mergers under Section 215c. In fact, the decision highlights that Congress could have added Section 215c to the National Bank Consolidation and Merger Act (as it did when it enacted Section 215a-1), thereby making Section 215c subject to the various provisions of that Act, including the corporate succession provision in Section 215a(e), but, for whatever reason, chose not to do so. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 439 (1935) (Cardozo, J., dissenting) ("[T]he meaning of a statute is to be looked for, not in any single section, but in all the parts together and in their relation to the end in view.").

In a similar vein, FNB's citation to a 1996 OCC corporate decision approving a merger under Section 215c further illustrates that FNB's position is incorrect. *See* OCC Corporate Decision No. 96-60, 1996 WL 700159 (Oct. 31, 1996). The decision does not even mention the

---

[46] The Court notes that the current version of 12 U.S.C. § 215a-1 uses the language "under this subchapter." When Congress added Section 215a-1 to Section 4 of the National Bank Consolidation and Merger Act through the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994, however, it used the language "under this Act." Pub. L. No. 103-328, 108 Stat. 2338 (1994).

[47] *Cf.* OCC Conditional Approval Decision No. 658, 2004 WL 2725968, at *17 n. 35 ("The phrase 'under this Act' in section 215a-1 clearly makes mergers under section 215a-1 subject to these provisions of section 215a. If they were not intended to be applicable, section 215a-1 would simply have authorized mergers that met the requirements of section 44, without any reference to the rest of the National Bank Consolidation and Merger Act.").

corporate succession provisions of Sections 215 or 215a and it actually concludes that "other laws governing mergers involving national banks," including Section 215a, do not apply to mergers under Section 215c. *See id.* at \*2, 13-14 ("[O]n its face, section 215a would not apply to this transaction [under section 215c] since the target – a federally-chartered savings bank – is not a 'state bank.'"). In a series of other decisions, the OCC has likewise concluded that Sections 215 and 215a do not apply to mergers under Section 215c.[48] FNB does not cite a single decision to the contrary in support of its position that since 1994 the OCC has recognized that the corporate succession provisions of Sections 215 or 215a apply to mergers under Section 215c.

As a result, the Court concludes that the OCC regulations and interpretations do not support FNB's theory that Park View continued within FNB upon consummation of the merger. Defendants assert, therefore, that FNB and Park View had no power in private contract to provide for a different legal outcome than the one mandated by the law and regulations. More specifically, Defendants contend that the corporate succession provision in the Bank Merger Agreement stating that FNB "shall be considered the same business and corporate entity" as Park View cannot be given effect.[49] FNB does not dispute this premise or attempt to argue that, notwithstanding the applicable OCC regulations and interpretations, the Bank Merger Agreement provides an independent basis to conclude that Park View continued within FNB.

Rather, FNB only asserts that the corporate succession provision in its Bank Merger Agreement is "entirely in accord" and "wholly consistent" with the applicable OCC regulations and interpretations, and that Park View continued within FNB "as a matter of law." *See* (ECF

---

[48] *See*, *e.g.,* OCC Corporate Decision No. 96-39, 1996 WL 479219, \*11 (Jul. 25, 1996); No. 96-56, 1996 WL 640413, \*12 (Sept. 30, 1996); No. 97-32, 1997 WL 367295, \*25 & n. 61 (May 31, 1997); No. 97-70, 1997 WL 540550, \*14 (Jul. 14, 1997); No. 97-112, 1997 WL 816872, \*4 & n. 7 (Dec. 30, 1997); No. 99-11, 1999 WL 342497, \*4 & n. 24 (Apr. 29, 1999); No. 99-28, 1999 WL 989406 (Sept. 13, 1999).

[49] *See* Def.s' Ex. T at § 6 (ECF No. 93-5).

No. 98 at 9-10, 13, 15). Because this provision of the Bank Merger Agreement is not consistent with the OCC regulations or interpretations, however, FNB's position here is without merit. Additionally, the Court rejects FNB's assertion that the OCC specifically approved the corporate succession language in the Bank Merger Agreement. The OCC approval letter did not address corporate succession; it did state, however, that the merger was subject to the "applicable OCC regulations and policies." As set forth above, the corporate succession provisions of other national bank statutes did not apply to the FNB-Park View merger under Section 215c during the relevant time period.

Consequently, JP Morgan correctly concluded that FNB could not satisfy the condition in the EAA that "[t]he Polices are not, and have not been previously, owned by an entity other than the Policyowner on or prior to the Immunization Termination Date."[50] As such, JP Morgan was not obligated to pay the Bank Enhancement Amount to Commonwealth General under the EAA. It follows, then, that Commonwealth General was not obligated to pay the Bank Enhancement Amount to Transamerica under the SVA, and Transamerica was not obligated to pay it to FNB under the Policies. When Transamerica paid FNB approximately $18 million at surrender, therefore, FNB received the entire amount it was owed under the Policies. For this reason alone, Transamerica is entitled to summary judgment on FNB's breach of contract claim. Nevertheless, the Court will proceed to analyze JP Morgan's second reason for refusing to pay the Bank Enhancement Amount.

### 2. Whether FNB could Demand Adequate Assurance under New York Law

The second reason JP Morgan refused to pay the Bank Enhancement Amount was based on its determination that FNB did not deliver "a fully executed and complete Surrender

---

[50] EAA at § 2(vi).

Certificate" that was "substantially in the form of the document attached as Exhibit C" to the EAA.[51] FNB has acknowledged in this litigation that the Surrender Certificate it submitted was not "substantially in the form" of Exhibit C to the EAA.[52] Indeed, prior to delivering the document to Transamerica, and on advice of its counsel, FNB deleted at least five paragraphs of the form. An important representation that FNB decided to delete stated that if JP Morgan determined that any of the representations made by FNB were not true, including the representation that FNB was the continuous owner of the Policies, then FNB "expressly agrees to pay [JP Morgan] an amount equal to . . . the amount paid by [JP Morgan] . . . in connection with the surrender," plus interest, legal fees, and expenses incurred by JP Morgan.[53] In light of FNB's admitted failure to satisfy this condition, Defendants assert that JP Morgan was justified in refusing to pay the Bank Enhancement Amount after it received notice of FNB's surrender of the Policies.

Based on the doctrine of demands for adequate assurance of performance, however, FNB contends that it had no obligation to satisfy this condition. FNB explains that in the events leading up to its surrender of the Policies, it made repeated demands to JP Morgan, Transamerica, and Clark for adequate assurance that if it made the representations contained in the form attached to the EAA, it would receive the Bank Enhancement Amount. All of FNB's demands for adequate assurance went unanswered. Therefore, FNB takes the position that it was not required to make the representations contained in the Surrender Certificate form attached to the EAA. Pursuant to a choice of law provision in the EAA, the parties agree that this issue is

---

[51] EAA at § 2(ii).
[52] Def.s' Ex. W, Free Dep. (ECF No. 93-8 at 9).
[53] *Compare* EAA, Ex. C *with* Def.s' Ex. N (ECF No. 91-14).

governed by New York law.[54]   For the reasons that follow, New York law does not support FNB's argument.

The seminal case in New York on this issue is *Norcon Power Partners, L.P. v. Niagara*, 705 N.E.2d 656 (N.Y. 1998).  In *Norcon*, a public utility entered into a twenty-five year contract with a power producer for the sale of electricity.  But only a few years after the parties executed the long-term contract, the utility anticipated that in future years, based on calculations set forth in the contract, the producer would not be able to perform all of its future repayment obligations.  The utility, therefore, demanded adequate assurance that the producer would perform under the contract in the future.  The producer responded to the demand by filing a lawsuit against the utility, asserting that the utility did not have the right to demand adequate assurance.

Until *Norcon*, the doctrine of demands for adequate assurance was recognized under New York law in only two situations: where the promisor becomes insolvent and where the contract is governed by the Uniform Commercial Code.  *Norcon*, 705 N.E.2d at 659.  *Norcon* extended application of the doctrine to common-law contracts that are analogous to certain contracts governed by the UCC.  *Id.* at 662.  The Court reasoned that the policies underlying the right to demand adequate assurance for UCC contracts "should apply with similar cogency for the resolution of this kind of controversy" because a "useful analogy can be drawn between the contract at issue [for the sale of electricity] and a contract for the sale of goods."  *Id.*  Given that the producer's future performance was still years away, the Court noted that the utility's potential quantifiable damages would only accumulate.  *Id.*  Thus, the Court determined that the circumstances justified the utility being able to mitigate its potential damages through the doctrine of demands for adequate assurance.

---

[54]   EAA at § 9(o).

*Norcon's* holding, however, was narrow.  It limited application of the doctrine  "to the type of long-term commercial contract between corporate entities entered into by [the utility] and [producer] here, which is complex and not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract."  *Id.*  Accordingly**,** since *Norcon,* courts in New York have been "reluctant to extend the right to demand adequate assurances of performance beyond insolvency settings, contracts for the sale of good governed by the Uniform Commercial Code, and closely analogous contracts."  *Jordan v. Can You Imagine, Inc.*, 485 F.Supp.2d 493, 502 n. 5 (S.D.N.Y. 2007); *see also  Bank of N.Y. v. River Terrace Assocs., LLC*, 23 A.D.3d 308, 309 (N.Y. App. Div. 2005) ("The Court of Appeals has enjoined the courts to proceed warily in extending this UCC doctrine to the common law of this State."); *Scott-Macon Securities, Inc. v. Zoltek Co.*, 2005 WL 1138476, *16 (S.D. N.Y. 2005) (questioning whether, under *Norcon*, the doctrine of demands for adequate assurance applies to "this non-UCC case").

Defendants argue that the doctrine of demands for adequate assurance does not extend to this case because, unlike *Norcon*, the contract at issue here merely involves a one-time promise to pay money and does not involve a party's financial ability to perform under the governing agreements.  In response, FNB contends that Defendants' position here is "flatly contradicted by precedent."  (ECF No. 106 at 4).  The only "precedent" that FNB cites to support this position, however, is a single case that is factually distinguishable.  *See Palco Telecom Svc., Inc. v. Global Warranty Group, LLC*, 2015 WL 1509598, *6 & n. 1 (E.D.N.Y. 2015) (applying the doctrine to a phone repair service contract where the plaintiff had already completed approximately $155,000 in repair services and was in the process of completing approximately $80,000 worth

of additional services).[55]   The Court agrees with Defendants that the doctrine of demands for adequate assurance does not extend to the agreements in this case, which "have very little in common with a sale of goods."   *See Merrill Lynch Intern. v. XL Capital Assur. Inc.*, 564 F.Supp.2d 298, 300, 306 (S.D.N.Y. 2008) (declining to extend the doctrine to the context of a credit default swap, which is "an arrangement similar to an insurance contract").

Moreover, aside from the fact that the governing agreements are not analogous to UCC contracts and there is no dispute as to whether any of the parties had the financial ability to perform thereunder, FNB fails to articulate how the situation was "not reasonably susceptible of all security features being anticipated, bargained for and incorporated in the original contract." *Norcon*, 705 N.E.2d at 662.   Both parties make arguments, albeit in other sections of their legal memoranda, that it was foreseeable under the governing agreements that JP Morgan might withhold the Bank Enhancement Amount.   Defendants assert, for instance, that "the parties consciously accounted for" this possibility, as evidenced by the surrenders clause in the supplements to the PPM, which Mr. Free from FNB admits reviewing in the fourth quarter of

---

[55]   Further, the Court finds that *Palco's* analysis is not persuasive and misstates New York law on this issue.   *Palco* mainly adopts the analysis of a state trial court decision, *Peng v. Willets Point Asphalt Corp.,* 27 Misc.3d 1210(A) (Sup. Ct. Queens Co. 2010), which *Palco* cites as being affirmed on appeal.   The part of the decision that *Palco* relies on, however, was not affirmed.   Indeed, the appellate court expressly stated that the trial court "erred in determining that '[t]he doctrine known as demand for adequate assurances of future performance . . . is applicable to this matter."   *Peng,* 81 A.D.3d 618 (N.Y. App. Div. 2011).   In support of this conclusion, the appellate court not only cited *Norcon*, but also cited *Bank of N.Y*, 23 A.D.3d at 309, which, as set forth above, explains: "The Court of Appeals has enjoined the courts to proceed warily in extending this UCC doctrine to the common law of this State."   As such, the Court also disagrees with the unsupported and inaccurate statement in footnote 1 of *Palco* (which FNB cites favorably) that, in light of *Norcon*, "New York courts have *routinely* extended the [doctrine] beyond only those situations involving the sale of goods."   *Palco*, 2015 WL 1509598, at *6 n. 1 (emphasis added).   To the contrary, as stated above, *Norcon's* holding was narrow and courts in New York have been "reluctant to extend the right to demand adequate assurances of performance beyond insolvency settings, contracts for the sale of good governed by the Uniform Commercial code, and closely analogous contracts."   *Jordan*, 485 F.Supp.2d at 502 n. 5.

2013 before he surrendered the Policies. *See* (ECF No. 103 at 6). Likewise, FNB contends that the "plain terms of the EAA" specifically contemplated that JP Morgan might incorrectly withhold the Bank Enhancement Amount, which would then trigger an "Event of Default" provision in the EAA obligating Transamerica to notify JP Morgan of its error and demand payment. *See* (ECF No. 106 at 2-3).[56] Thus, given that it was foreseeable at the time when all of the governing agreements were executed that JP Morgan might withhold the Bank Enhancement Amount at surrender, the doctrine of demands for adequate assurance does not extend to this case. *Norcon*, 705 N.E.2d at 662.

For all of these reasons, the doctrine of demands for adequate assurance does not excuse FNB's failure to "strictly satisfy" the condition of delivering "a fully executed and complete Surrender Certificate" that was "substantially in the form of the document attached as Exhibit C" to the EAA. Because it is undisputed that FNB failed to satisfy this condition, JP Morgan was justified in its refusal to pay the Bank Enhancement Amount. In turn, under the structure of the governing agreements, Transamerica properly deducted the Bank Enhancement Amount from the amount owed to FNB, and Transamerica is consequently entitled to summary judgment on this breach of contract claim.

### B. Insurance Bad Faith against Transamerica

The parties spend little time discussing FNB's insurance bad faith claim, relegating the issue to a few footnotes in their legal memoranda. As FNB previously argued at the motion to dismiss stage, however, the law for an insurance bad faith claim in Ohio and Pennsylvania is similar. (ECF No. 16 at 25-26) (citing *Stewart v. Siciliano*, 985 N.E.2d 226, 229 (Ohio Ct. App. 2012) and *Hanover Ins. Co. v. Ryan*, 619 F.Supp.2d 127, 140 (E.D. Pa. 2007)). Defendants

---

[56] *See also* EAA at § 5(d)(i). In addition, as noted above, FNB concedes that its breach of contract claim fails if JP Morgan's refusal to pay the Bank Enhancement Amount was correct.

argue here that if the Court determines that Transamerica is entitled to summary judgment on the breach of contract claim because it paid FNB the entire amount that was due under the Policies, then this claim for insurance bad faith necessarily fails. (ECF No. 90 at 21 n. 8) (citing *Johnson v. State Farm Life Ins. Co.*, 695 F.Supp.2d 201, 215 (W.D. Pa. 2010); *Novinger Grp., Inc. v. Hartford Ins., Inc.*, 514 F.Supp.2d 662, 674 (M.D. Pa. 2007)). FNB does not dispute this premise.

Instead, FNB argues that its insurance bad faith claim is viable because "Transamerica's refusal to pay the [Bank Enhancement Amount] was not 'predicated upon circumstances that furnish reasonable justification there[for].'" (ECF No. 20 n. 12) (quoting *Stewart*, 985 N.E.2d at 229). But as FNB has conceded in this action, Transamerica did not have to pay the Bank Enhancement Amount to FNB if JP Morgan correctly refused to pay that amount to Commonwealth General in the first instance. Because both of JP Morgan's reasons for withholding the Bank Enhancement Amount were correct, then, by FNB's own concession, Transamerica was reasonably justified in deducting the Bank Enhancement Amount from the amount it paid to FNB. Transamerica is, accordingly, entitled to summary judgment on this claim.

### C. Breach of Fiduciary Duty against Clark

The parties dispute whether FNB's claim for breach of fiduciary duty against Clark is governed by Pennsylvania or Ohio law. The Court's initial task here, therefore, is to determine whether "these states would actually treat this issue any differently." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007) (quoting *Air Products & Chem., Inc. v. Eaton Metal Prod. Co.*, 272 F.Supp.2d 482, 490 n. 9 (E.D. Pa. 2003)). If there is no conflict between the laws, then a choice of law analysis is unnecessary. *Id.* For the reasons that follow, the Court concludes that neither law imposes a fiduciary duty under the circumstances of this case.

In Ohio, a fiduciary relationship arises in situations where "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Employment of Pratt*, 321 N.E.2d 603, 609 (Ohio 1974). Although Ohio law "has recognized a public interest in fostering certain professional relationships, such as the doctor-patient or attorney-client relationships, it has not recognized the insurance agent-client relationship to be of similar importance." *Tornado Tech., Inc. v. Quality Control Insp., Inc.*, 977 N.E.2d 122, 127 (Ohio App. 2012). FNB does not cite any cases indicating that Ohio law treats a relationship between an insurance broker and client any differently than a relationship between an insurance agent and client.[57] Thus, a fiduciary relationship between FNB and Clark exists under Ohio Law only if they both mutually understood "that a special trust or confidence has been reposed." *Id.*

Similarly, in Pennsylvania, a fiduciary duty does not arise as a matter of law for a relationship between an insurance broker and a client. *Wisinski v. Brown & Brown Ins. Co. of Pa.*, 906 A.2d 571, 578-79 (Pa. Super. 2006). A fiduciary duty arises from a confidential relationship "whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence over the other." *McCown v. Fraser*, 192 A. 674, 565 (Pa. 1937); *Stewart v. Hooks*, 94 A.2d 756, 759 (Pa. 1953) (noting that the terms "fiduciary relationship" and "confidential relationship" carry the same meaning in

_____

[57] At the motion to dismiss stage, when the Court had to accept as true FNB's allegations that Clark assisted and cooperated with Transamerica in manipulating the cash surrender value owed to FNB (a position which FNB has since abandoned), the Court cited *Lawarre v. Fifth Third Secs., Inc.*, 2012 WL 3834052, *2 (Ohio App. 2012) and *Friedman v. Ohio Dept. of Ins.*, 2003 WL 22208805, *2 (Ohio Ct.App.2003) for the general proposition that an insurance broker, like other kinds of brokers, could plausibly owe a client a fiduciary duty in Ohio under those circumstances. *See First Nat. Bank of Pennsylvania v. Transamerica Life Ins. Co.*, 2015 WL 321657, at *7 (W.D. Pa. Jan. 23, 2015). The securities brokers at issue in those cases, however, owed the client a fiduciary duty as a matter of law. The same is not true for insurance brokers, however, which only owe the client a fiduciary duty in specific factual circumstances.

Pennsylvania).  A confidential relationship "appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981).  But where one party does not succumb to any overwhelming influence of the other party, does not cede decision-making control to the other party, and proceeds to act on his or her own, then the parties do not have a confidential relationship under Pennsylvania law. *Yenchi v. Ameriprise Fin., Inc.*, ___ A.3d ___, 2017 WL 2644473, *8-9 (Pa. 2017);[58] *see also Wisinski*, 906 A.2d at 578-79 ("for the great majority of broker-client interactions, the relationship will not be so extremely one-sided as to be confidential").

For our purposes, there are no relevant differences in these laws to warrant a choice-of-law analysis. *Hammersmith*, 480 F.3d at 230.  FNB is a national bank with extensive resources that unilaterally deferred to its own in-house counsel, not Clark, on its decision to delete numerous representations from the Surrender Certificate, which gave JP Morgan a justifiable reason to withhold the Bank Enhancement Amount.  As Clark notes, FNB's corporate designee was unable to point to a single instance where FNB relied on any of Clark's advice after FNB

---

[58]  In *Yenchi*, the Pennsylvania Supreme Court recently examined its jurisprudence in this area. Explaining that the test "cannot be reduced to a particular set of facts or circumstances," *Yenchi* analyzed the following non-exhaustive variety of circumstances where Pennsylvania courts have found a fiduciary duty to be present: (1) "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed;" (2) when a party has some special vulnerability creating a unique opportunity for the other party to take advantage of the vulnerability; (3) when one party lacks the ability to understand the nature and terms of the transaction and, based upon well-established relationships, simultaneously reposes his or her complete trust in the other party; (4) when one party places his or her "complete and unhesitating trust" in the other party with the effect of ceding his or her decision-making power to the other party; or (5) where one party is otherwise "overpowered, dominated or unduly influenced in [his or her] judgment by [the other party]." *Yenchi*, 2017 WL 2644473, *6-9 (citations omitted).  As set forth more fully in the body, the facts here are not comparable to any of these situations examined in *Yenchi*.

became the Policyowner. Thus, even if JP Morgan's refusal to pay the Bank Enhancement Amount was not justified, these facts alone belie FNB's suggested notion that it was not dealing on equal terms with Clark, *Frowen*, 425 A.2d at 416-17, or that Clark was in a position of superiority or influence resulting from FNB placing a special trust in Clark. *Pratt*, 321 N.E.2d at 609.

Further, the Court notes that one of FNB's own arguments in support of this claim actually illustrates why Clark did not owe FNB a fiduciary duty. FNB faults Clark for not conducting a proper investigation after learning that JP Morgan would be withholding the Bank Enhancement Amount. In this regard, FNB notes that Clark's corporate designee, Mr. Parker, testified in his deposition that the entire "investigation" that Clark conducted on the issue was a single phone call to JP Morgan. According to FNB, this demonstrates that Clark violated its duty of "utmost loyalty" to FNB. On closer examination, however, Mr. Parker's deposition testimony here actually leads to a different conclusion: Clark and FNB did not have a fiduciary relationship in the first place.

Mr. Parker testified that he "provided [FNB's Treasurer] Mr. Free the information and let [Mr. Free] decide on his own" what to do, especially since he knew that FNB's attorneys reviewed it.[59] FNB does not dispute that it had its own attorneys involved in reviewing the situation. Additionally, although FNB takes issue with Clark's lack of investigation, there are no facts suggesting that FNB ever surrendered control of the matter over to Clark. *See In re Scott's Estate*, 316 A.2d 883, 886 (Pa. 1974). Under Ohio law, this claim is defeated because there are no facts in the record from which a reasonable factfinder could conclude that Clark and FNB

---

[59] Pl.'s Ex. 13 (ECF No. 100-13); *see also* Pl.'s Ex. 39 (ECF No. 100-39) (Mr. Parker testifying FNB is a large financial institution who has its own attorneys, and we don't provide legal advice").

mutually understood that a special trust or confidence had been reposed in Clark based on their relationship. *See Tornado Tech.*, 977 N.E.2d at 127. This claim similarly fails under Pennsylvania law because there no facts in the record suggesting that FNB ceded its decision-making control in Clark. *See Yenchi*, 2017 WL 2644473, at *8. In fact, even after JP Morgan refused paying the Bank Enhancement Amount, FNB acted on its own in trying to persuade JP Morgan to reconsider its decision. Therefore, regardless of which law we apply, Clark is entitled to summary judgment on this claim because there are no facts that would otherwise convert the parties' arm's-length transaction into a confidential relationship. *Id.* (citing *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 522 (6th Cir. 1999) (applying Ohio law)).[60]

## VII. CONCLUSION

In accordance with the foregoing, Defendants are entitled to summary judgment on all of FNB's claims. An appropriate Order and Judgment Order will follow.

---

[60] In addition, the Court notes that under Ohio law, even if Clark owed FNB a fiduciary duty and failed to observe that duty, the facts here do not establish that Clark's actions proximately resulted in FNB's injuries. *See Troja v. Pleatman*, 65 N.E.3d 809, 812 (Ohio App. 2016) (listing elements of breach of fiduciary duty claim). As set forth above, FNB's own actions, not Clark's, caused JP Morgan to withhold the Bank Enhancement Amount, and FNB's corporate designee was unable to identify anything that FNB did in reliance or would have done differently had it not received Clark's purported "bad advice." Thus, even if the Court were to only apply Ohio law to this claim, as FNB has urged, Clark is nevertheless entitled to summary judgment. *See Infocision Mgt. Corp. v. Michael D. Sammy Ins. Agency, Inc.*, 2014 WL 5361492, *5 (Ohio. App. 2014) (affirming entry of summary judgment where a lapse in coverage occurred not because of the agent's actions, but rather as a direct result of the insured's own actions); *Lawarre v. Fifth Third Secs., Inc.*, 2012 WL 3834052, *4-5 (Ohio App. 2012) (affirming entry of summary judgment on breach of fiduciary duty claim where reasonable minds could not differ that the defendant did not cause the plaintiffs' harm).

Dated:  <u>July 6, 2017</u>.

By the Court:

<u>s/ Cynthia Reed Eddy</u>
Cynthia Reed Eddy
United States Magistrate Judge

cc: all registered users of CM-ECF

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIRST NATIONAL BANK OF PENNSYLVANIA, AS SUCCESSOR BY MERGER TO PARK VIEW FEDERAL SAVINGS BANK, | ) ) ) ) ) | Civil Action No. 14-1007 |
| Plaintiff, | ) ) | United States Magistrate Judge |
| v. | ) ) | Cynthia Reed Eddy |
| TRANSAMERICA LIFE INSURANCE COMPANY & CLARK CONSULTING, INC., | ) ) ) ) | |
| Defendants. | ) | |

## ORDER

**AND NOW**, this 6th day of July, 2017, upon consideration of the above-captioned Defendants' motion for summary judgment and all of the documents filed by the parties in connection therewith, it is hereby **ORDERED** that Defendants' motion (ECF No. 89) is **GRANTED** and that summary judgment is entered in favor of Defendants.

By the Court:

s/ Cynthia Reed Eddy
Cynthia Reed Eddy
United States Magistrate Judge

cc: all registered users of CM-ECF